BALFOUR GUTHRIE, INC.

v.

HUNTER MARINE TRANSPORT, INC. and SCNO Barge Lines, Inc.

No. 3–86–0902.

United States District Court, M.D. Tennessee, Nashville Division.

Dec. 15, 1987.

Allan B. Thorp Price, Criss & Thorp, Memphis, Tenn., C. Dewey Branstetter, Jr., Nashville, Tenn., for plaintiff.

John S. Sandberg, Gary D. McConnell, Shepherd, Sandberg & Phoenix, St. Louis, Mo., E. Clifton Knowles, Bass, Berry & Sims, Nashville, Tenn., for defendant SCNO Barge Lines, Inc.

John W. Wagster, Hollins, Wagster & Yarbrough, Nashville, Tenn., for defendant Hunter Marine Transport.

## MEMORANDUM

WISEMAN, Chief Judge.

In this case, the defendant SCNO Barge Lines has moved for sanctions against the plaintiff Balfour Guthrie under Federal Rule of Civil Procedure 11. Before signing pleadings, motions, or papers described by Rule 11, an attorney or pro se litigant must be satisfied after reasonable inquiry that the document signed is well grounded in fact, that it is warranted by existing law or a good faith belief in changing the law, and that it is not interposed for any improper purpose.[1] SCNO claims that Balfour Guthrie filed a complaint alleging that SCNO damaged 109 steel coils owned by the plaintiff during shipment, although the plaintiff's pre-filing inquiry disclosed facts that only exculpated SCNO. SCNO also contends that Balfour Guthrie's response to

---

1. *See* Fed.R.Civ.P. 11.

SCNO's motion for summary judgment is sanctionable because the plaintiff's attorneys allegedly failed to examine the shipment contract and bill of lading before fashioning their arguments.

## I.

In August of 1984, Balfour Guthrie, owner of 109 steel coils, contracted with SCNO Barge Lines to deliver the coils to Hunter Marine, a storage warehouse in Nashville.[2] When rust was discovered on the coils, Balfour Guthrie filed a complaint against SCNO and Hunter Marine for breach of contract, breach of bailment, and negligence. The complaint, filed on October 21, 1986, alleges that the damage to the coils must have occurred either during transport by SCNO or during storage by Hunter Marine.

Balfour Guthrie's insurance surveyor, K.W. Diers, investigated the cause of damage in the spring of 1985. After examination of both the Hunter Marine warehouse records and the coils, Diers concluded that the rusting had occurred after condensation had formed on the coils at the warehouse.[3] One year later, in preparation for litigation, Balfour Guthrie's counsel hired a marine surveyor, Captain Zane, to discover when and how the coils had rusted. Zane studied Diers' reports and agreed with Diers' conclusion that the rust formed on the coils while they were stored in Hunter Marine's warehouse.[4] Unbeknownst to plain-

2. Complaint, *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 3–86–0902) (filed Oct. 21, 1986).

3. *See* Affidavit of Captain C. Zane [hereinafter "Zane Affidavit"], Exhibits Z–76 to Z–80. In an April 16, 1985 letter by Diers to Balfour Guthrie, Diers reported that he made one inspection of the coils at Hunter Marine's warehouse and a more detailed examination of six coils selected at random and transported to Nashville Steel Corporation. All six coils showed evidence of rust. Testing revealed that there was no seawater in the cans in which the coils were stored. Diers said that the coils were in the warehouse from September 12, 1984 until at least April of 1985. Diers observed that coils from the lot shipped out in November of 1984 were not reported by Hunter Marine or by the customer who received them to have been damaged in any way. Accordingly, Diers concluded that the rust was caused by sweating or condensation that resulted some time after the coils were stored at Hunter Marine. *Id.*

Diers traced some of the coils to S & G Metals Company in Kansas City and issued a very similar report to Balfour Guthrie on May 20, 1985. The results of both examinations are summarized in a July 3, 1985 letter to Balfour Guthrie. That letter assigns responsibility for the rusting to Hunter Marine. *See* Zane Affidavit, Exhibits Z–82 to Z–85 and Z–73 to Z–74.

4. Zane Affidavit, Exhibits Z–9 to Z–24. In Zane's affidavit, Zane explains that he first concluded that Hunter Marine was responsible for the damage after review of Diers' report in the summer of 1986. Zane told plaintiff's attorney of this opinion orally around August 8, 1986. In October, approximately two months after the complaint had been filed, Zane reemphasized his position in his recommendations to plaintiff's counsel, urging the use of climatological data to strengthen the case against Hunter Ma-

rine. Relevant portions of Zane's December 26, 1986 letter read as follows:

From the case file you sent me, continuity of transit is well established, verifying loss was sustained a considerable time after the coils were in care/custody storage of Hunter Marine.

The fact that some coils were delivered from the overall lot storage without damage claim [sic] should reasonably indicate that the remaining subsequent damaged coils were the result of inadequate protection against weather elements while in storage. In essence, while the coils may have been in covered warehouse storage, there apparently was no protection against severe temperature changes.

In my opinion the key documents would be the climatological data from the weather bureau closest to the warehouse facilities. This should establish an official record of the ambient frezze [sic] thaw conditions condusive to moisture/rusting accruals.

The report of Diers and Associates, Inc. dated April 16, 1985 concludes with opinion, "Damages appear to have resulted from the time cargo was stored in warehouse, because reportedly, no loss was was [sic] reported against coils which were shipped out shipped out [sic] of warehouse in November, 1984."

I can concur with the opinion....

It is suggested you review your existing case file for documents relating to Hunter marine [sic] and then request any documents relative to in/out warehouse receipts for the purpose of establishing if any exceptions were made by Hunter Marine.

It is also suggested that you request warehouse activity and/or payroll records concerning the handling cost of coils. There may be a possibility that coils may have been rehandled while in warehouse storage for space accomodations [sic] or the like. If such is the

tiff's counsel, Captain Zane was also employed by SCNO at the time he gave his opinion assigning full liability to Hunter Marine.

At the time the complaint was filed, Balfour Guthrie's counsel believed that both experts' opinions supported a claim against Hunter Marine.[5]  Before naming SCNO, however, the plaintiff's attorneys specifically discussed with their client whether there were sufficient facts to justify the complaint under Fed.R.Civ.P. 11.[6]  Although Diers and Zane agreed that the rust formed at the warehouse, Balfour Guthrie made a claim against SCNO.  An affidavit of the plaintiff's attorney gave three reasons for filing suit against SCNO: (1) Hunter Marine continued to disclaim fault; (2) Balfour Guthrie employees had no personal knowledge of how the coils were handled; and (3) neither Diers nor Zane had personal knowledge of how the coils were handled.[7]

After SCNO had been named in the October 21, 1986 complaint, Captain Zane told Balfour Guthrie's counsel that he worked for SCNO and would not testify against the company.[8]  Counsel's response was to urge Zane to remain an expert in the case

against Hunter Marine and to assure Zane that he would not be required to testify against SCNO.[9]  Despite these assurances, in March of 1987 Zane gave his entire file on the case to his SCNO superiors, who relayed them to SCNO's counsel.[10]  At this time, SCNO learned that Balfour Guthrie may have believed as early as the spring of 1985, the date of Diers' report and one and a half years before the complaint was filed, that SCNO was not responsible for the damage to the coils.

On April 6, 1987, SCNO's attorneys told Balfour Guthrie that SCNO suspected a Rule 11 violation and demanded a voluntary dismissal with prejudice under Fed.R. Civ.P. 41.[11]  Balfour Guthrie countered on April 16 by offering a voluntary dismissal without prejudice if SCNO would withdraw its pending motion for summary judgment and cooperate in the case against Hunter Marine.[12]  SCNO refused and moved for sanctions on July 31.

SCNO's motion argues that Balfour Guthrie made the reasonable pre-filing inquiry required under Rule 11 and that the result of that inquiry should have led Balfour Guthrie not to file suit against SCNO.[13]

---

case, the relative weight bearing forces of the coil rounds would change enhancing moisture ingress between the coil windings.  In that some coils were shipped out in November 1984 there is a probability that some coils rehandling occured [sic].  And if some coils were rehandled during freeze periods, or shortly before or after, in warehouse, this would compound the likelyhood [sic] of moisture accruals between windings.
   A paramount factor in the interrogatory discover [sic] would be the questions and answers relative to temperatue [sic] controls, if any, in the warehouse.
   Further, discover if the warehouse is constructed so as to provide a wind force barrier to inhibit strong circulation of air in the warehouse which usually accompany [sic] frigid temperatures.  A strong circulation of frigid air could create a 'flash type freeze' of any moisture between windings which in turn would prlong [sic] thaw and aggravate rusting exposure.
   Based on known facts and factors it is reasonable to conclude that damages to coils occured [sic] while in care and custody of Hunter Marine, and that Hunter Marine did not have reasonable storage facilities or did not exercise reasonable prcautions [sic] for cargo protection.

Zane Affidavit, Exhibits Z–9 to Z–10.

5.  Affidavit of Allan B. Thorp in Opposition to SCNO's Motion of Sanctions [hereinafter "Thorp Affidavit"] at 2.

6.  *Id.*

7.  *Id.*

8.  Zane Affidavit, Exhibit Z–6; Thorp Affidavit at 3–4.

9.  Thorp Affidavit at 3–4.

10.  *Id.* at 4–6; Exhibit 6 (letter from plaintiff's attorney to Zane, Apr. 8, 1987).

11.  Motion for Sanctions at 5.  This conversation was confirmed by letter on May 13, 1987. Thorp Affidavit at 6–8; Exhibit 8 (letter from SCNO counsel to plaintiff's attorney, May 13, 1987).

12.  Motion for Sanctions at 5.

13.  As support, SCNO cited attachments to the Zane affidavit and the plaintiff's answers to Hunter Marine's interrogatories, in which Balf-

In response, Balfour Guthrie's counsel claims that he had a good faith basis in fact and law for filing against SCNO and that the claim was not made for any improper purpose. Balfour Guthrie also argues that it was unable to dismiss its claims against SCNO in view of SCNO's outstanding motion for summary judgment.[14]

In March of 1987, SCNO filed a motion for summary judgment against Balfour Guthrie. This motion, submitted before Captain Zane's disclosures to SCNO, argued that Balfour Guthrie's complaint was filed after the time period permitted in a notice-to-sue provision incorporated into the shipping contract through the bill of lading.[15] Balfour Guthrie's perfunctory response to the motion for summary judgment argued that the terms of the bill of lading, which contained the limitations period, were never incorporated into the contract and were not signed by the plaintiff or its agents.[16] Hence, Balfour Guthrie

our Guthrie said the coils left SCNO in good condition. Answers to these interrogatories, submitted by plaintiff's counsel to Hunter Marine on May 15, 1987, show that the opinion Balfour Guthrie held before filing the complaint against SCNO remained unchanged after subsequent discovery. These answers have been neither sworn nor notarized.

2. State all facts and information upon which you allege in your cmplaint [sic] that the coils were delivered to SCNO in New Orleans in good and undamaged condition.
Answer to Interrogatory Number 2:
The SCNO Bill of Lading; the fact that there were no exceptions taken to the coils when they were delivered by SCNO to Hunter Marine; and, the fact that some of the coils had been delivered to customers and were undamaged.

\*        \*        \*        \*        \*        \*

8. State all facts and information upon which you allege in your complaint that SCNO delivered the coils to Hunter Marine in a good and undamaged condition.
Answer to Interrogatory Number 8:
The Bill of Lading of SCNO; the fact that Hunter Marine made no exceptions to the condition of the coils; and, the fact some of the coils had been delivered to customers who made no claim as to the condition.

9. State all facts and information upon which you allege in your complaint that SCNO delivered the coils to Hunter Marine in a damaged condition.
Answer to Interrogatory Number 9:
The Plaintiff has no knowledge except for information which the Defendant Hunter Marine has concerning the condition of the coils when delivered by SCNO to Hunter Marine.

\*        \*        \*        \*        \*        \*

19. State all facts and information upon which you allege in your complaint that defendant is guilty of breach of contract and/or breach of bailment.
Answer to Interrogatory Number 19:
Discovery is continuing. However, the coils were delivered to Hunter Marine in a good condition and were redelivered damaged. Hunter Marine did not exercise proper temperature control to warehouse the coils without damage.

See Notice of Filing Document, *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 3–86–0902) (filed Aug. 5, 1987) (interrogatories and answers are attached).

**14.** Plaintiff's Memorandum Opposing SCNO's Motion for Sanctions at 2–3, 9–10; Supplemental Memorandum Opposing Motion for Sanctions at 2–3.

**15.** SCNO's Motion for Summary Judgment. The straight bill of lading required that SCNO receive written notice of any claims for damage to the shipment within nine months of delivery, and that suits arising from these claims be instituted within two years and one day from the date of SCNO's receipt of the written notice. *Id.* at 2. According to SCNO, the bill of lading was issued pursuant to the transportation contract between SCNO and Balfour Guthrie's agent, Houston Stevedores. The transportation contract was said to incorporate the bill of lading in its entirety. Both the bill of lading and accompanying Freight Schedule 800, referenced in the transportation contract between plaintiff's agent and SCNO, contain the limitations period. *See* Reply of SCNO Barge Lines, Inc. to Plaintiff's Response to SCNO's Motion for Summary Judgment and attachments.

**16.** Plaintiff's Response to Motion for Summary Judgment by SCNO Barge Lines, Inc. The response is reprinted in its entirety.
PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT BY SCNO BARGE LINES, INC.
The defendant, SCNO Barge Lines, Inc., has filed a Motion for Summary Judgment alleging that the plaintiff's claim is time-barred because neither notice of the claim to the defendant nor the filing of suit occurred within the limitations periods stated on the back of the bill of lading. (Exhibit A to Affidavit of Gerald Weinmann, Vice President of SCNO Barge Lines, Inc.)
The defendant is not entitled to summary judgment on this issue because the limitations periods relied on did not become part of the contract of the parties. "A stamp or notice on the back of a bill of lading does not constitute a part of the contract or vary its obligations unless it receives the assent of the shipper or

asserted that the contractual limitation never came into being.

This Court granted SCNO's motion in August 1987.[17] The Court observed that, plaintiff's objection notwithstanding, the terms of the limitations period on the face of the bill were expressly incorporated in the transportation contract in Freight Schedule 800 and that Balfour Guthrie had actual notice of that contract. Further, the Court noted that the face of the bill incorporated the transportation contract. Finally, the Court also determined that the notice-to-sue provision was a common commercial practice and that limitations periods of much shorter duration had been upheld as reasonable.

SCNO's motion for sanctions argues that Balfour Guthrie's response to the motion for summary judgment is sanctionable because it showed that plaintiff's counsel had not closely examined the contract produced to them.[18] Balfour Guthrie responds that the documents produced did not show that the parties ever contracted for a notice-to-sue provision. Balfour Guthrie adds that "a good faith dispute as to whether the statute of limitations has run can be no basis to support a Rule 11 motion."[19]

## II.

### *The Original Rule 11*

Rule 11, adopted into the Federal Rules of Civil Procedure in 1938, tried to promote the responsible practice of law but offered neither guidance in defining appropriate conduct nor flexibility in punishing breaches of it. The 1938 Rule reads as follows:

> Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attor-

ney shall sign his pleading and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. *The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay.* If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted. (Emphasis added).

Rule 11 once required "good ground" to support a pleading and banned any pleading interposed for delay. If a violation occurred, sanctions were not mandated by the Rule; but if the court did impose sanctions, only one choice was permitted by the Rule—to strike the pleading entirely. Because the Rule relied on a subjective good faith standard to detect violations and allowed only one harsh penalty for violators, courts rarely enforced Rule 11. *See* Nelken, *Sanctions Under Amended Federal Rule 11—Some "Chilling" Problems in the Struggle Between Compensation and Punishment*, 74 Georgetown L.Rev. 1313, 1314–17 (1986) [hereinafter "Nelken"]. An attorney's genuine belief in the validity of the pleadings was usually sufficient protection from sanctions Under Rule 11. *See,*

---

is incorporated by reference on the face of the bill, ..." 70 AmJur2d *Shipping*, § 736. The front side of the bill of lading exhibited to the Weinmann Affidavit does not incorporate by reference the terms and conditions on the back side, nor is the bill signed by Balfour Guthrie, Inc. or its agent.

Therefore, the plaintiff requests that the defendant's Motion for Summary Judgment be denied.

**17.** Memorandum and Order, *Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 3–86–0902) (August 6, 1987).

**18.** Motion for Sanctions at 4; Memorandum in Support of Motion for Sanctions at 7.

**19.** Plaintiff's Memorandum Opposing SCNO's Motion for Sanctions at 3–7.

*e.g., Nemeroff v. Abelson,* 620 F.2d 339, 350 (2d Cir.1980) (because action not without foundation, no subjective bad faith sufficient to warrant sanctions).

### Changes in Rule 11: The 1983 Amendment

The new Rule 11, amended in 1983, took shape because of frustrations with both the strictures of the old Rule and the explosion of litigation in the federal courts. An increased desire to let federal courts manage their dockets and the urge to discourage unfounded filings were also contributing factors. Rule 11 was one in a series of several amended rules designed to make lawyers more accountable for their actions, increase judicial management of cases, improve the discovery process, and encourage use of sanctions where appropriate.[20] Federal Rule of Civil Procedure 11 now reads as follows:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. *The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.* If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee. (Emphasis added).

Rule 11 now applies not just to pleadings, but to pleadings, motions, and papers signed by an attorney or pro se litigant. Although the amended Rule mandates sanctions for violations, the severity of the sanction is within the trial court's discretion. Fed.R.Civ.P. 11, Notes of Advisory Committee. Sanctions may be imposed against an attorney, a client, or both attorney and client. Sanctions may be imposed against a pro se litigant. *See Kurkowski v. Volcker,* 819 F.2d 201 (8th Cir.1987); *Doyle v. United States,* 817 F.2d 1235 (5th Cir.1987). The signer's experience or inexperience will not revoke a sanction mandated by Rule 11 but may affect the severity of the penalty. *Compare Unioil, Inc. v. E.F. Hutton & Co.,* 809 F.2d 548, 557–59 (9th Cir.1987) (sanctions of $294,141.10 upheld in part because attorney was experi-

---

**20.** Nelken at 1317. In her article on Rule 11, Nelken describes the 1983 amendments to Federal Rules of Civil Procedure 7, 11, 16, and 26 as an "integrated package" promoting judicial management. These rules

focus on the pretrial process and attempt to remedy the perceived inefficiencies and abuses of the system by increasing judicial oversight of litigation and by diminishing the incentives for certain kinds of litigation behavior through sanctions provisions. Rule 7(b)(3) makes explicit the application of Rule 11 to motions as well as pleadings. Rule 16, which expands the role of pretrial conferences, is a "blueprint for management," and rule 26 puts the judge in the driver's seat with respect to the scope of discovery. Rule 11 is a general provision that supplements the case management tools prescribed in rules 16 and 26.

*Id.*

enced and firm specialized in complex business litigation) *with Brown v. Nationwide Mut. Ins. Co.,* 805 F.2d 1242, 1244 (5th Cir.1986) (trial court had reduced sanctions to $1,000 because it considered counsel sufficiently humiliated by a first time offense).

Perhaps the most important difference in the amended Rule is that it incorporates an objective standard of reasonableness into the evaluation of attorney conduct. The standard is one of reasonableness under the circumstances. This standard is more stringent than the original good faith formula and thus it is expected that a greater range of circumstances will trigger its violation. Fed.R.Civ.P. 11, Notes of Advisory Committee (citations omitted). Attorney conduct is evaluated in light of what a competent attorney would reasonably have believed at the time the pleading, motion, or paper was filed. *Id.*

Courts often say that the subjective standard of good faith no longer applies in Rule 11 cases. *See Greenberg v. Sala,* 822 F.2d 882 (9th Cir.1987) (before 1983, Rule 11 was interpreted to require subjective bad faith by a signing attorney ... but amended Rule 11 tests the actions of a signing attorney by a standard of objective reasonableness under the circumstances). *See also INVST Financial Group v. Chem–Nuclear Systems,* 815 F.2d 391, 401 (6th Cir.1987), *cert. denied, Garratt v. INVST Financial Group, Inc.,* — U.S. —, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987), *citing Albright v. Upjohn Co.,* 788 F.2d 1217, 1221 (6th Cir.1986); *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1127 (5th Cir.1987); *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 829 (9th Cir.1986); *Whittington v. Ohio River Co.,* 115 F.R.D. 201, 208 (E.D.Ky.1987). Some writers believe that amended Rule 11 modifies the good faith formula of the original Rule by restricting it to two areas: in the attorney's belief about arguments for the extension, modification, or reversal of existing law and in

the prohibition against filing documents for an improper purpose. *See Whittington,* 115 F.R.D. at 208, n. 23; Nelken at 1320. One commentator observes that the new Rule adds an objective layer to the subjective core of traditionally sanctionable bad faith conduct. *Id.*

### Requirements of Rule 11

Rule 11 applies to pleadings, motions, or papers signed by an attorney or a pro se litigant. An attorney who does not sign one of these documents cannot be sanctioned under Rule 11. *See In re Ruben,* 825 F.2d 977 (6th Cir.1987). Limiting sanctions to the person who signed makes sense in light of the certification rationale for the Rule and avoids the need for extra discovery to find out who prepared the document. *See Robinson v. National Cash Register,* 808 F.2d at 1129.[21]

■ There are three critical components to Rule 11. Measuring the conduct of counsel that is subject to sanctions by an objective standard of reasonableness under the circumstances, a court must impose sanctions if reasonable inquiry discloses that the pleading, motion, or paper is

(1) not well grounded in fact; or

(2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; or

(3) interposed for any improper purpose, such as harassment or delay.

*Knop v. Johnson,* 667 F.Supp. 512, 516 (W.D.Mich.1987), *citing Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1174 (D.C.Cir. 1985); Fed.R.Civ.P. 11.

In *Albright v. Upjohn Co.,* 788 F.2d 1217 (6th Cir.1986), the Sixth Circuit discussed what constitutes reasonable inquiry sufficient to show that a complaint is well grounded in fact. The court upheld Rule 11 sanctions against a plaintiff who sued a drug manufacturer solely because it had

---

**21.** In *Robinson,* the Fifth Circuit observed that a signing attorney may be subject to sanctions even if the attorney is an associate signing at the direction of a partner or a local attorney signing for out-of-state counsel. The court warned attorneys to be selective about the documents they sign. *See id.* at 1128–1129. The Ninth Circuit disagrees under some circumstances. *See Unioil, Inc. v. E.F. Hutton & Co.,* 809 F.2d 548, 558 (9th Cir.1987), *citing* Schwarzer, *Sanctions Under the New Rule 11—A Closer Look,* 104 F.R.D. 181 (1985).

been a defendant in similar suits and because her medical records were illegible and incomplete. The plaintiff, who had sued several different manufacturers, was using discovery to determine whether her claims against Upjohn had any merit. *Cf. Southern Leasing Partners v. McMullan,* 801 F.2d 783, 786 (5th Cir.1986) (counsel filed complaint hoping discovery would uncover facts to support its claims); *Whittington v. Ohio River Co.,* 115 F.R.D. at 206 (a claim must not be asserted in the mere hope that discovery will turn up something against the defendant). The Sixth Circuit sanctioned Albright's action because she asserted her claim against Upjohn with knowledge that she had no factual basis for it. *Albright v. Upjohn Co.,* 788 F.2d at 1221, n. 7. *Cf. INVST Financial Group v. Chem–Nuclear Systems,* 815 F.2d at 402 (motion for recusal not well grounded in fact when Judge had made no comments showing personal bias against the defendants).

■ Factual errors in a complaint need not result in Rule 11 sanctions. In a recent case, the Ninth Circuit denied sanctions imposed against a attorney who had put in over 100 hours of pre-filing research because neither clear legal authority nor the litigant's own admission erased the factual underpinning of the litigant's pleading. *Greenberg v. Sala,* 822 F.2d at 889 (9th Cir.1987). By contrast, minimal pre-filing research that consists primarily of conversations with a client is not enough to show that a complaint is well grounded in fact. *See Southern Leasing Partners v. McMullan,* 801 F.2d 783 (5th Cir.1986). However, extended research alone will not redeem a claim that is without legal or factual merit. *Knop v. Johnson,* 667 F.Supp. at 516.

■ Determining what constitutes reasonable inquiry sufficient to show that the pleading, motion or paper is well grounded in existing law or in a good faith belief in changing the law seems more difficult. In *Whittington v. Ohio River Co.,* the Eastern District of Kentucky observed that a competent attorney must do enough research to know what the existing law in the case is. 115 F.R.D. at 207-08. Hence, if a controlling case is fatal to a claim and a reasonably competent attorney would have found it, the claim is not well grounded in law. *Id. See INVST Financial Group v. Chem–Nuclear Systems,* 815 F.2d at 403 (cursory review of Fed.R.Civ.P. 12 would have shown the motion to dismiss was improper); *Robinson v. National Cash Register Co.,* 808 F.2d at 1131 (law of res judicata clearly barred the claim); *Southern Leasing Partners v. McMullan,* 801 F.2d at 788–789 (argument that res judicata not applicable to case mere rhetoric that misstates the law). Shotgun complaints may be suicidal, inflicting Rule 11 sanctions. *See Thomas v. Capital Security Services,* 812 F.2d 984, 986 (5th Cir.1987); *Southern Leasing Partners,* 801 F.2d at 787; *Whittington,* 115 F.R.D. at 207. If the area of law is considered complex and uncertain, however, Rule 11 sanctions are rarely granted under this provision. *See Vatican Shrimp Co. v. Solis,* 820 F.2d 674, 681 (5th Cir.1987).

Deciding what are reasonable inquiries into fact and law requires the court to balance the legitimate concerns about shotgun pleadings and frivolous filings against several factors: the Rule's own admonition not to stifle attorneys' creativity and enthusiasm, the general intent of the Federal Rules to replace technical code pleading with more liberal pleading rules, and the need for change and growth in the law itself. *See* Fed.R.Civ.P. 11, Notes of Advisory Committee. *See generally* Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions,* 100 Harv.L. Rev. 630 (1987).

Rule 11 labels harassment and delay as improper purposes, and the Advisory Committee Notes observe that the litigation process may be abused for other purposes as well. When there is neither factual nor legal support for a claim, it may be construed as frivolous. *See Kurkowski v. Volcker,* 819 F.2d at 204 (farmers' pro se complaint against lenders sanctionable when filed in face of previous dismissals involving the same parties under the same legal theories); *INVST Financial Group v. Chem–Nuclear Systems,* 815 F.2d at

402–03 (motion for recusal without basis in fact or law); *Brown v. Nationwide Mut. Ins. Co.*, 805 F.2d at 1244–45 (neither legal nor factual merit in plaintiff's claim against insurance company for failure to settle fast enough). The Ninth Circuit observes that harassment must do more than bother, annoy or vex the complaining party. *Zaldivar v. City of Los Angeles*, 780 F.2d at 832. Hence, successive complaints based upon propositions of law previously rejected may constitute harassment. *Id.* Similarly, a blizzard of poorly prepared but potentially dispositive motions submitted shortly before trial may be construed as harassment. *Knop v. Johnson*, 667 F.Supp. at 519–20. A motion filed to delay a hearing has been filed for an improper purpose. *INVST Financial Group*, 815 F.2d at 402. By contrast, political motives for filing a lawsuit that is well grounded in fact and law have been held not to be improper. *Zaldivar*, 780 F.2d at 834. These cases reveal two patterns. Either the document is so devoid of factual and legal merit that any purpose for which it has been filed must be improper, or the document has been filed for some purpose other than the orderly resolution of disputes through litigation.

### Beyond Rule 11: Continuing Duty

If a pleading, motion, or paper certified by an attorney's or pro se litigant's signature fails the three part test of Rule 11, sanctions must be imposed. Fed.R.Civ.P. 11. The Advisory Committee's Notes emphasize that the signer's compliance is to be judged by what was reasonable to have been believed at the time the document was filed.

Some courts have asked whether the duty imposed by Rule 11 at the time of filing continues throughout the litigation. They speculate about whether the attorney who files in compliance with Rule 11 and thereafter learns that the document is not well grounded in law or fact must take further action. When the document in question is a complaint, the issue arises whether a voluntary dismissal under Federal Rule of Civil Procedure 41 is required.

Circuit courts are split as to whether Rule 11 imposes a continuing duty. The Fifth Circuit invokes the doctrine as a sensible extension of the rule. *See Thomas v. Capital Security Services*, 812 F.2d at 988; *Robinson v. National Cash Register*, 808 F.2d at 1127; *Southern Leasing Partners v. McMullan*, 801 F.2d at 788. By contrast, the Second Circuit opposes the continuing duty doctrine because it is viewed as undercutting the language of the Rule and the intent of the drafters. *See Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir. 1986); *Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805, 809 (2d Cir.1987).

The Sixth Circuit's position on continuing duty is unclear. In dicta, the court has suggested that a plaintiff whose claim lacked merit at the outset should have dismissed it.

> Albright asserted her claim for liability against Upjohn with the knowledge that she had no factual basis for the claim and continued to assert it long after it would have been reasonable to have dismissed it.

*Albright v. Upjohn Co.*, 788 F.2d at 1221, n. 7. *Albright* turned on the plaintiff's failure to make a reasonable prefiling inquiry. The Court determined that the claim violated Rule 11 at the time of filing. Because the continuing duty issue only arises in the context of a reasonable filing that later becomes unreasonable, it is uncertain what position this Circuit would adopt on the issue.

Interestingly, several circuits have imposed sanctions for Rule 11 violations even after voluntary dismissal under Fed.R. Civ.P. 41. *See Greenberg v. Sala*, 822 F.2d 882 (9th Cir.1987); *Kurkowski v. Volcker*, 819 F.2d 201 (8th Cir.1987); *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073 (7th Cir.1987).

### III.

SCNO's motion for sanctions against Balfour Guthrie raises two questions: whether the original complaint was filed in violation of Rule 11 and whether Balfour Guthrie's response to SCNO's motion for summary judgment also violated the Rule.

## The Complaint

Balfour Guthrie's complaint, signed by attorney Allan Thorp and filed on October 21, 1986, is clearly a pleading that falls within the bounds of Rule 11. The plaintiff conducted a reasonable pre-filing investigation by hiring two different experts to discover what had caused the steel coils to rust.

Plaintiff's compliance with the Rule ends at this point, however. The reasonable inquiry, based on first hand examination of the coils and the warehouse records, disclosed facts that only exculpated SCNO. Diers inspected the coils both at Hunter Marine and at another warehouse to which they had been transported for the purpose of further testing. Tests on six coils selected at random revealed gradations of rust on the coils in the *absence* of seawater, an element one might expect to be present had the coils been improperly handled by SCNO. Review of Hunter Marine's own records confirmed this analysis. Coils from Balfour Guthrie's lot were delivered to a customer in November of 1984, two months after SCNO had delivered them to the warehouse. Neither Hunter Marine nor the customer who received the coils reported any damage to them.

Captain Zane agreed with this analysis before the complaint was filed; afterwards, he suggested discovery of climatological data as a means of fixing damage *exclusively* on Hunter Marine. With hindsight, Captain Zane's credibility is questionable: as an SCNO employee who refused to testify against his employer, Zane could have been expected to point the finger at the only remaining defendant in the lawsuit, Hunter Marine. Yet, the Advisory Committee's Notes to Rule 11 caution against hindsight judgments and urge the Court to consider what it would have been reasonable for Balfour Guthrie's counsel to believe about SCNO's potential liability when the complaint was filed.[22] Counsel for the plaintiff says that he did not know Captain Zane worked for SCNO until well after the filing.[23] Hence, plaintiff's counsel had no reason to doubt Zane's opinion of Diers' study. In addition, Zane's credibility is irrelevant to the force of Dier's analysis, available to plaintiff's counsel for over a year before the lawsuit began.

Balfour Guthrie's justifications for filing suit against SCNO in light of these factual findings are weak at best. Hunter Marine's protestations of innocence are insufficient to make the complaint well-grounded in fact when every factual finding pointed to Hunter Marine as the culprit. Indeed, Hunter Marine could scarcely have been expected to say anything else. The issue is not whether the other defendant's belief in SCNO's liability was reasonable, but whether Balfour Guthrie's belief was reasonable. It was not.

The plaintiff's argument that neither its experts nor employees had first hand knowledge of how the coils were handled is not persuasive. At least one of the plaintiff's experts, Mr. Diers, had personal knowledge of the condition of the coils at the warehouse, because he examined them there. The plaintiff hired experts presumably because plaintiff was willing to rely on opinions based not on direct observation of the coils' storage and transport but on tests made thereafter. In short, Balfour Guthrie made reasonable inquiry through its two experts but lacked any basis in fact to support its claim against SCNO at the time of filing.

This conclusion is strengthened by three pieces of evidence showing that months after the complaint was filed, plaintiff's counsel continued to believe that there was no basis in fact for the suit against SCNO. In December of 1986, Captain Zane confirmed in writing his initial position that

---

**22.** The Court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion or paper was filed. Fed.R.Civ.P. 11. Notes of Advisory Committee. [I]n considering the nature and severity of the sanctions to be imposed, the court should take account of the attorney or party's actual or presumed knowledge when the pleading or other paper was signed. *Id. See INVST Financial Group v. Chem–Nuclear Systems,* 815 F.2d 391, 401 (6th Cir.1987).

**23.** Thorp Affidavit at 3.

the rusting of the coils was attributable solely to Hunter Marine. In May of 1987, Balfour Guthrie's answers to Hunter Marine's interrogatories showed the plaintiff's belief that the coils had been delivered by SCNO to the warehouse in good condition. Most importantly, in the spring of 1987, up to seven months after the complaint was filed, Balfour Guthrie's counsel admitted that it had no evidence to support a claim against SCNO.

> By the time this request [by SCNO to dismiss under Fed.R.Civ.P. 41] had been made, discovery had been taken, all of which indicated the coils had been delivered to Hunter in a good and undamaged condition.[24]

Because the Court finds that Balfour Guthrie's original complaint against SCNO lacked any basis in fact when filed, there is no need to reach the continuing duty issue, which only arises when a once worthy claim is later discovered to be meritless. Balfour Guthrie resembles the plaintiff in *Albright*, who knew that the claim was not well grounded in fact and continued to assert the claim long after it would have been reasonable to dismiss it. *Albright v. Upjohn Co.*, 788 F.2d at 1221, n. 7.

The plaintiff asserts that because the damage must have occurred either during shipment or storage, the claims against SCNO can defeat Rule 11 sanctions under a theory of alternate liability. The plaintiff in *Albright*, who sued several drug manufacturers on theories of concert of action and alternate liability, made a similar argument. The Sixth Circuit observed

> the basis of [Upjohn's] Rule 11 motion was that Albright failed to reasonably investigate the *facts*, not that Albright failed to conduct a reasonable inquiry into the *law*. Whether or not Albright's assertion of joint enterprise liability was warranted by a good faith argument of existing law is not determinative of the question of whether she made reasonable prefiling inquiry into the facts to satisfy the affirmative duty imposed by Rule 11.

*Id.* at 1221, n. 5. In the case before this Court, Balfour Guthrie's prefiling inquiry

made the claim against SCNO unreasonable. The existence of alternate liability theory does not change that result. Lawsuits do not exist in a theoretical vacuum—they require real disputes between real parties. That under different facts the law would have provided a theory of recovery does not change this result.

There is also evidence in the record that Balfour Guthrie filed suit against SCNO for improper purposes: to "fish" for some evidence of SCNO's liability and to compel SCNO to cooperate in the case against Hunter Marine. The plaintiff makes much of SCNO's refusal to withdraw its motion for summary judgment after SCNO asked Balfour Guthrie to dismiss the claim. Balfour Guthrie argues that SCNO's pending motion prevented voluntary dismissal. Federal Rule of Civil Procedure 41(a)(1) reads as follows:

**Rule 41. Dismissal of Actions**

**(a) Voluntary Dismissal: Effect Thereof.**

**(1) By Plaintiff; by Stipulation.** Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

The language of the rule makes clear that a pending motion for summary judgment will not preclude dismissal if the parties agree to the dismissal. In this case, the parties could not agree because Balfour Guthrie refused to dismiss the complaint

---

**24.** Plaintiff's Supplemental Memorandum Opposing Motion for Sanctions at 2.

with prejudice. The plaintiff sought to use a groundless complaint to prompt SCNO's aid in the suit against Hunter Marine, and at the same time wanted to leave open the possibility of a later suit against SCNO on the merits. When Balfour Guthrie's counsel had admitted that there was no real basis in fact for the SCNO claim, such machinations constitute an improper purpose.

To some extent, the uproar created by the parties over voluntary dismissal is a tempest in a teacup. The parties neither agreed to dismissal nor did one party move the Court to dismiss. Even if voluntary dismissal had occurred, this would not prevent this Court from imposing sanctions under Rule 11.

The Court finds that Balfour Guthrie made a reasonable prefiling inquiry into the facts of the case. That inquiry disclosed that a claim against SCNO was without merit. Further discovery failed to uncover any evidence to refute the initial findings that exculpated SCNO. The Court finds that Balfour Guthrie's claim against SCNO was not well grounded in fact. The Court also finds that Balfour Guthrie filed the claim for improper purposes.

### The Response to SCNO's Motion for Summary Judgment

■ Examined in light of other circumstances, Balfour Guthrie's abbreviated response to SCNO's motion for summary judgment also reveals the plaintiff's failure to make a reasonable inquiry into the facts of the case. Balfour Guthrie argued that the parties never agreed to a limitations period in the contract because the front of the bill of lading did not incorporate the terms on the back of the bill and because the bill was not signed by Balfour Guthrie or its agents.

In response to the motion for sanctions, plaintiff's attorney makes two arguments: (1) that a good faith belief that a limitations period has not run defeats a Rule 11 motion; and (2) that Balfour Guthrie did not produce to its counsel either the Transportation Contract or the Freight Schedule.

Without these documents the cross-references to the limitations period presumably would be impossible to ascertain.

Clearly, the issue before the Court is not whether the attorney's response was filed in good faith. Instead, the issue is whether the attorney, after reasonable prefiling inquiry, had a sufficient basis in fact and law for the filing and lacked an improper purpose. The Court concludes that the attorney failed to make a reasonable pre-filing investigation of the relevant documents. SCNO alleges that it actually produced all of the contractual documents to plaintiff's counsel before the response was made.[25] Even if SCNO had not done this, it should have been a relatively simple matter for Balfour Guthrie's counsel to contact its client and retrieve all the documentation necessary, including the names of its agents.

Careful review of the bill of lading, the transportation contract, and the Freight Schedule show that plaintiff's arguments in the response to the motion were without factual support. In this Court's Memorandum Opinion on SCNO's motion for summary judgment, the Court observed that the face of the bill incorporates the transportation contract between SCNO and Houston Stevedores, plaintiff's agent, in language specifying that it is "subject to the contract in effect on date of issue of this original Bill of Lading." The Court observed:

Plaintiff further contends that it lacked notice of the notice-to-sue provision because the terms on the reverse side of the bill of lading are not expressly incorporated by reference on the face of the bill. As SCNO has pointed out, however, the notice provision is part of its Freight Schedule 800, which is expressly referred to in the transportation contract, of which plaintiff had actual notice before the carriage ever began when its agent Mr. Milam signed it on July 27, 1984. Exhibit C to SCNO's Reply Memorandum. Memorandum and Order.

25. Memorandum in Support of Motion for Sanctions at 7.

*Balfour Guthrie, Inc. v. Hunter Marine Transport* (No. 1–86–0902); August 6, 1987 at 4, n. 4. This Court is not sanctioning plaintiff's attorney because he responded to a motion and lost on the merits. Rather, the Court is imposing sanctions because the response shows an insufficient basis in facts available to Balfour Guthrie's counsel.

There is another reason why sanctions are appropriate. SCNO need never have moved for summary judgment if the complaint had not been filed. Rule 11 applies not just to complaints, but to pleadings, motions, and papers. Fed.R.Civ.P. 11. A response to a motion for summary judgment that is made without reasonable inquiry into the facts on which the motion is based violates Rule 11. For the same reason that sanctions are justified on the complaint, sanctions are warranted on the response.

### IV.

In *Knop v. Johnson*, 667 F.Supp. at 521, the Eastern District of Michigan cited the Sixth Circuit's decision in *INVST Financial Group, Inc.*, 815 F.2d 391, 404 (6th Cir.1987) and explained how to award an opposing party the reasonable expenses it incurs because of the improper filing of the pleading, motion, or other paper.

[I]n order to award the fees sought by plaintiff's counsel ..., the court must find that the actions for which fees are sought were reasonably necessary to defend against the motions. A reasonableness inquiry necessarily requires a determination as to what extent plaintiff's expenses and fees could have been avoided and were self-imposed. When counsel is called upon to defend against its adversary's unreasonable motion practices, he must mitigate damages by correlating his response, in terms of hours and funds expended, to the merit of the claims. The mitigation requirement prevents a party from misusing rule 11 sanctions in order to benefit from the errors of opposing counsel. The district court is therefore required to balance carefully these competing interests in determining the amount of sanctions. *Id.* at 404 (footnote and citations omitted).

Rule 11 expressly provides, of course, that an award of the opposing party's reasonable expenses, including a reasonable attorney's fee, is only one possible sanction. A district court, moreover, is given wide discretion "in deciding the nature and extent of sanctions to impose." *Knop*, 667 F.Supp. at 522.

This Court orders that the plaintiff Balfour Guthrie and its counsel be sanctioned for filing the initial complaint against SCNO. Plaintiff's counsel will also be sanctioned for the response to SCNO's motion for summary judgment. SCNO may present proof of costs and attorney's fees to the Magistrate. Those costs and fees determined to be reasonable under the guidelines explained by the Sixth Circuit in the *INVST* case will be awarded to SCNO.

### ORDER

For the reasons stated in the Court's memorandum opinion, the defendant's motion for sanctions is granted. The defendant SCNO will be awarded costs and attorney's fees from both the plaintiff Balfour Guthrie, Inc. and from the plaintiff's attorneys, Price, Criss & Thorp, in an amount determined by the Magistrate to be reasonable under the guidelines imposed by the Sixth Circuit in *INVST Financial Group v. Chem–Nuclear Systems*, 815 F.2d 391, 404 (6th Cir.1987).